UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

AMANDA J. KREISER,                :
                                  :CIVIL ACTION NO. 3:15-CV-1603
         Plaintiff,               :
                                  :(JUDGE CONABOY)
         v.                       :
                                  :
CAROLYN W. COLVIN,                :
Acting Commissioner of            :
Social Security,                  :
                                  :
         Defendant.               :
                                  :

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  (Doc. 1.)  She originally alleged disability beginning September 27, 2008, and later amended the onset date to June 3, 2011.  (R. 14.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Paula Wordsworth, concluded in her January 27, 2014, decision that Plaintiff's severe impairments of obesity, schizoaffective disorder, generalized anxiety disorder,  posttraumatic stress disorder ("PTSD"), bipolar disorder, alcohol abuse, hypertension, and bilateral carpal tunnel syndrome did not alone or in combination meet or equal the listings.  (R. 16-21.)  She also found that Plaintiff had the residual function capacity ("RFC") to perform sedentary work with certain nonexertional limitations and that she was capable of performing jobs that existed in significant

numbers in the national economy.  (R. 21-26.)  ALJ Wordsworth therefore found Plaintiff was not disabled under the Act through December 31, 2013, the date last insured.  (R. 26.)

With this action, Plaintiff asserts that the Acting Commissioner's decision should be reversed or the matter should be remanded for the following reasons: 1) substantial evidence does not support the ALJ's finding that Plaintiff's mental health impairments do not meet or equal listing 12.04; 2) substantial evidence does not support the ALJ's RFC assessment; 3) the ALJ erred in relying on the non-examining physician over the treating physician's opinion; 4) the ALJ failed to properly evaluate lay opinions and medical evidence of record; 5) substantial evidence does not support the ALJ's credibility evaluation; and 6) the Commissioner failed to sustain her burden of showing there is other work in the national economy that Plaintiff could perform.  (Doc. 12 at 2.)  After careful consideration of the administrative record and the parties' filings, I conclude this appeal is properly denied.

## I. Background

### A.   Procedural Background

Plaintiff protectively filed for DIB on November 20, 2012. (R. 14.)  Plaintiff alleged disability beginning on September 27, 2008, and later amended it to June 3, 2011.  (*Id.*)  The claims were initially denied on December 27, 2012, and Plaintiff filed a

request for a hearing before an ALJ on January 31, 2013.   (*Id.*)

ALJ Wordsworth held a video hearing on December 9, 2013.  (R. 65-130.)  Plaintiff, who was represented by an attorney, testified as did Vocational Expert ("VE") Nadine Henzes.  (R. 14, 65.)  As noted above, the ALJ issued her unfavorable decision on January 27, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 26.)

On March 24, 2014, Plaintiff filed a Request for Review with the Appeals Council.  (R. 7.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on June 18, 2015. (R. 1-6.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On August 17, 2015, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on September 21, 2015.  (Docs. 9, 10)  Plaintiff filed her supporting brief on December 3, 2015.  (Doc. 12)  Defendant filed her brief on January 8, 2015.  (Doc. 10).  Plaintiff filed a reply brief on January 13, 2016.  (Doc. 15.)  Therefore, this matter is fully briefed and ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on November 3, 1983--she was thirty years old on the date last insured of December 31, 2013.  (R. 16, 25.) Plaintiff has a high school education and has past relevant work as

3

a customer service representative and cashier.  (R. 25.)

**1.   <u>Impairment Evidence</u>**

a.   <u>*Mental Health Impairments*</u>

i.   *Philhaven*[1]

Plaintiff was hospitalized at Philhaven from May 8, 2010, to May 11, 2010.  (R. 307.)  She admitted herself voluntarily due to mood lability and suicidal ideation, with urges to self-mutilate. (*Id.*)  At the time of admission Plaintiff's assessed GAF was 30 and at discharge three days later it was 51.  (*Id.*)  Her highest GAF in the past year was noted to be 60.  (*Id.*)  Upon discharge, Plaintiff was alert and oriented times three, her mood was improved (although her affect remained somewhat restricted), she denied suicidal or homicidal ideation or the presence of auditory or visual hallucinations, there was no indication of an altered thought process, and she agreed to follow up with therapy and medication management at T.W. Ponessa.  (R. 308-09.)

ii.   *T.W. Ponessa & Associates Counseling Services, Inc.*

Records from T.W. Ponessa & Associates show that Plaintiff followed up there for medication management after her hospitalization.[2]  From May 2010 through October 2010, Plaintiff

---

[1]   Although well before the relevant time period, Plaintiff refers to this record numerous times so I include it in the summary of relevant evidence.

[2]   Plaintiff had received outpatient therapy from T.W. Ponessa but was discharged in June 2010 because she had attended only one session in April 2010.  (R. 356.)  The primary reason for the

reported improvement though she said she still had occasional auditory hallucinations.  (R. 368, 378, 384.)  Plaintiff's GAF was assessed at 60 during this time.  (*Id.*)  Though recommended, Plaintiff did not attend individual psychotherapy.  (*See*, *e.g.*, R. 379.)

Progress Notes from Plaintiff's February 11, 2011, Medication Management appointment indicate that Plaintiff had not been seen since October and she had gone off her medications in November. (R. 372.)  Plaintiff reported auditory and visual hallucinations, paranoia, a return of mood swings, and feeling depressed and anxious.  (*Id.*)  Her GAF was assessed to be 50-55.  (R. 372.)  A medication regimen was resumed and Plaintiff denied the need for individual psychotherapy. (R. 373.)  In March, April and May 2011, Plaintiff's medications were being adjusted and she continued to refuse individual therapy.  (R. 363-66, 370-71.)

When she was seen on June 27, 2011, Plaintiff described improvement in voices but appeared tired on Haldol.  (R. 361.) Plaintiff was noted to be pleasant and cooperative and preoccupied by legal problems stemming from being arrested for theft.  (*Id.*) Her mood and affect were recorded to be a bit more anxious than at her previous examination and her insight and judgment appeared

discharge was non-compliance in that she had attended only one
session.  (R. 357.)  Her GAF at the time was recorded to be 60.
(R. 356.)  The summary indicates that Plaintiff reported being off
her medications since September 2008.  (*Id.*)

fair. (*Id.*)  She reported occasional auditory hallucinations but felt they were well-controlled and she reported no delusions or hallucinations of other senses. (*Id.*)  Plaintiff's medications were adjusted, and she was encouraged to start individual psychotherapy at T.W. Ponessa. (R. 362.)  It was recommended that she return in four weeks. (*Id.*)

In a T.W. Ponessa & Associates Client Discharge Summary dated August 24, 2012, Plaintiff's diagnosis was listed as schizoaffective disorder, bipolar type, and generalized anxiety disorder. (R. 355.)  Other problems included morbid obesity and right ankle surgeries. (*Id.*)  Plaintiff's GAF was recorded to be 50-55. (*Id.*)  Plaintiff's admission date was June 4, 2009, and the date last seen was June 27, 2011. (*Id.*)  She was discharged from medication management because of non-attendance. (*Id.*)  The Summary noted that Plaintiff's goals "included attending psychiatric evaluation and following recommendations of psychiatrist [but she] made limited progress due to non-attendance." (*Id.*)

*iii.  NHS Human Services*

At her initial psychiatric evaluation visit to NHS Human Services on August 21, 2012, Plaintiff was seen by Saverio Laudadio, D.O.  (R. 285-88.)  Plaintiff reported that she had been in jail for five months for a probation violation, conspiracy to commit retail theft, and she had mental health symptoms "her whole

life." (R. 285.) Her mental status examination showed that she was alert and cooperative, oriented times three, and there was no evidence of hallucinations, delusions or illusions. (R. 286.) Dr. Laudadio reported that Plaintiff's voice was soft and monotonous, her speech was spontaneous, relevant and coherent, her affect was blunted and mood dysphoric, her eye contact was fair, her insight and judgment were poor, and she had no suicidal or homicidal ideation. (*Id.*) Dr. Laudadio diagnosed alcohol abuse, dysthymic disorder, and generalized anxiety disorder. (R. 288.) He assessed a GAF of 50. (*Id.*) He noted that counseling was medically necessary and he recommended that she start counseling at Schuylkill Mountain Center, continue her medication regimen with the addition of Buspar and Navane, and return for follow-up in one month. (*Id.*)

In a Medication Management Progress Note dated October 23, 2012, Dr. Laudadio noted that Plaintiff was compliant with her medications and had no side effects. (R. 303.) Other than labile mood and blunted affect, no problems were noted: sleep was normal; behavior was cooperative; and no delusions, paranoia or hallucinations were reported. (*Id.*) However, in the Additional Information section of the Note, Plaintiff reported that anxiety and paranoid delusions persisted and she requested a medication review. (*Id.*)

Another Medication Management Progress Note dated November 20,

2012, indicates that Plaintiff was compliant with her medications.
(R. 301.)  Plaintiff reported no side effects of the medications
and she did not report delusions, hallucinations or paranoia.
(*Id.*)  Her sleep was noted to be normal and no other problems were
identified in the check-the-box portion of the form. (*Id.*)  Under
"Additional Information," it was recorded that Plaintiff reported
anxiety symptoms dominated the clinical picture.  (*Id.*)

Plaintiff appears to have seen someone at NHS on several
occasions from August 3, 2012, to February 25, 2014.  (R. 289-93,
294-99, 462-64, 496-98.)  The four Person Centered Treatment Plans
of record appear to have been completed by Deirdre Rahn.  (*Id.*)
The reason for services was listed as history of bipolar disorder,
extensive mood swings, paranoia, anxiety, and possible
hallucinations.  (R. 289, 294.)  Challenges were noted to be mood
swings and frequent bouts of anxiety with associated paranoia.
(*Id.*)  In November 2013, a challenge for Plaintiff was noted to be
"[e]xtreme fluctuations in mood that are accompanied by visual and
auditory hallucinations during extreme stress."  (R. 462.)  At
that time it was also noted that Plaintiff had "made some progress
controlling her moods without all of her medications.  Anxiety
related to pregnancy complications continues to be high."  (*Id.*)
Plaintiff reported "I want to control my moods until I'm done

breast feeding."[3]   (*Id.*)

*iv.   Other*

On July 16, 2013, Plaintiff saw John W. Ross, D.O., for a Maternal Fetal Medicine Consult.  (R. 325-32.)  Dr. Ross noted that Plaintiff had stopped taking Wellbutrin and Ability on May 30, 2013, because of her pregnancy.  (R. 325.)  She reported that she had been moody, depressed, and had hallucinations since she stopped taking the medications.  (*Id.*)

An ultrasound report dated October 21, 2013, indicates that Plaintiff was "feeling well and . . . without complaints."  (R. 350.)

*b.   Physical Impairments*

Carpal tunnel syndrome is the only physical impairment specifically addressed in the "Summary of Impairments" section of Plaintiff's brief.  (Doc. 12 at 10.)  For evidence of the impairment, she points only to a medical source statement by Plaintiff's family doctor, Lynda Graves.  (*Id.*)  As this is a reference to the Residual Functional Capacity Questionnaire completed by Dr. Graves on November 5, 2013, it will be reviewed below as opinion evidences.  (*See* R. 481-85.)

---

[3]   Although after the relevant time period, a February 13, 2014, Treatment Plan note, indicates that "the birth of her child several weeks premature is correlated by increased anxiety, irritability and conflict with her partner.  Paranoid delusions and visual and auditory hallucinations continue, most commonly after nightfall."  (R. 496.)  She again stated that she wanted to control her moods while breast feeding.  (*Id.*)

2.  **Opinion Evidence**

*a.  State Agency Psychologist*

On December 24, 2012, John Gavazzi, Ph.D., a non-examining State agency psychologist, reviewed evidence from Plaintiff, her mother, and NHS Human Services.  (R. 108-09.)  Dr. Gavazzi found that Plaintiff had mild restrictions in her activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace, and she had no episodes of decompensation, each of extended duration.  (R. 110.) In his Mental Residual Functional Capacity Assessment, Dr. Gavazzi opined that Plaintiff could "understand, retain, and follow simple job instructions, i.e., perform one-and two-step tasks, [and she could] perform simple, routine, repetitive work in a stable environment."  (R. 111-12.)  He also found that Plaintiff was able to make simple decisions and she could maintain regular attendance and be punctual.  (R. 112.)   Dr. Gavazzi noted that, although Plaintiff struggled with social skills, she could communicate clearly, relate appropriately to familiar others, and behave predictably in most social situations.  (R. 112-13.)

*b.  Treating Therapist*

Deirdre Rahn, M.S., CCPT, completed a Mental Impairment Questionnaire on November 5, 2013.  (R. 475-80.)  She said she had seen Plaintiff weekly to biweekly in individual therapy since July 3, 2012, with therapy focused on anxiety, mood disturbance and

paranoid delusions/hallucinations.  (R. 475.)  Ms. Rahn noted that progress was minimal in all areas and the prognosis was poor. (*Id.*)  She also identified many areas in which Plaintiff had no useful ability to function and extreme limitations in maintaining social functioning as well as four or more periods of decompensation within a twelve month period, each of at least two weeks duration.  (R. 477-78.)  Ms. Rahn also noted that Plaintiff had a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," she had a "[c]urrent history of 1 or more years inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement," and an "anxiety related disorder and complete inability to function outside the area of one's home."  (R. 479.)

c.  *Primary Care Physician*

Dr. Lynda Graves completed a Residual Functional Capacity Questionnaire on November 5, 2013.  (*See* R. 481-85.)  The form identified Carpal Tunnel Syndrome as the only diagnosis.  (R. 481.) Symptoms included extreme numbness in both hands, severe burning when lying down, and difficulty with grasping.  (*Id.*)  Dr. Graves identified Plaintiff's depression, anxiety, PTSD, and schizoaffective disorder as aggravating factors.  (R. 482.)  She opined Plaintiff could sit for one hour before she would need to

11

get up, she could stand for ten minutes before she would need to sit down, in an eight-hour day she could sit, stand/walk for less than two hours, she would need three-minute periods of walking around every sixty minutes, she would need a job that would permit her to shift positions from sitting to standing/walking at will, she would need breaks every hour for ten to fifteen minutes, her legs would need to be elevated six to twelve inches fifty percent of the time, she could occasionally lift less than ten pounds and never more than that, she could never crouch/squat or climb ladders, she could never grasp, turn or twist objects, perform fine manipulations or reach, and she would likely miss work about four days per month.  (R. 484-86.)

## 3.   **Function Reports**

In her December 14, 2012, Function Report, Plaintiff stated that she was unable to work because her illnesses prevented her from leaving the house, and she thought people were talking about her and she was being followed.  (R. 242.)  She said she cared for her daughter and got help from her boyfriend and her mother.  (R. 243.)  Plaintiff said she slept only two to four hours a night, prepared meals that did not require use of the stove, occasionally did the dishes, and picked up after her daughter.  (R. 244.)  She said that she went outside once or twice a month, she either drove a car or was a passenger, and she did not go out alone because of fears.  (*Id.*)  Plaintiff identified the following as being affected

12

by her illnesses or conditions: talking, hearing, seeing, memory, completing tasks, concentration, understanding, following instructions, and getting along with others.  (R. 247.)  She attributed problems in these areas to auditory and visual hallucinations, loss of memory, racing thoughts, and paranoia. (*Id.*)  Plaintiff said she could walk for twenty minutes before she needed to stop and rest for five minutes.  (*Id.*)  She said she was not good at following written instructions and very bad at following spoken instructions.  (*Id.*)  She also reported that she was not good at getting along with others and handling stress.  (R. 248.)

Plaintiff's mother, Jody Kreiser, completed a Third Party Function Report on December 13, 2012.  (R. 231-38.)   Her responses were similar to those provided by Plaintiff.[4]  (*Id.*)

4. **Hearing Testimony**

At the December 9, 2013, ALJ hearing, Plaintiff testified that she was living with her six year old daughter and her boyfriend, and her second child was due on February 2, 2014.  (R. 36, 40.) Plaintiff said she believed she was unable to work because she had issues with showing up at previous jobs, she had anxiety in general about leaving her house, and she could not go out alone at night. (R. 38.)  She added that she had issues with getting along with

---

[4]  The handwriting in the two reports was remarkably similar. (R. 231-38, 242-49.)

coworkers and people in general.  (*Id.*)

Plaintiff identified her physical problems to be carpal tunnel syndrome in both hands and two reconstructive surgeries on her right ankle, one in 1997 and the second in 1999.  (R. 38.)  She was not receiving any treatment for her ankle but stated that it swelled and was painful if she stood for too long.  (*Id.*) Plaintiff was wearing splints/braces on both hands at the hearing but she had not had any physical therapy or surgery for the problem.  (R. 38-39.)

Regarding her mental condition, Plaintiff said she was first diagnosed with bipolar disorder, depression, and anxiety when she was twenty and had been hospitalized three times--in 2004, 2009, and 2010.  (R. 39-40.)  Plaintiff stated she was unable to take one of her mental health related medications (Abilify) at the time of the hearing because of her pregnancy.  (R. 40.)

When asked how long she could sit in an eight-hour workday, Plaintiff responded she would be able to do so for an hour before she would have to get up and walk "for a couple of minutes."  (R. 40-41.)  Plaintiff estimated she could lift objects that weighed up to twenty or twenty-five pounds.  (R. 41.)

Regarding household chores, Plaintiff said she helped with cooking, and sometimes with cleaning and putting laundry away and her boyfriend did most of the chores.  (*Id.*)  She said she goes shopping with others and does not like to go out alone because she

14

gets anxious and paranoid.  (*Id.*)

Plaintiff testified that she did not have a big circle of friends, she just kept to herself and a few others.  (R. 42.)  She also identified problems with concentration and noted that she had auditory and visual hallucinations with varying frequency depending on her manic or depressed state and she also had suicidal thoughts. (R. 42-43.)

The VE was asked to consider a hypothetical individual of the same age and education as Plaintiff who can perform sedentary work with the following limitations: frequent climbing stairs and ramps; occasional climbing ropes, ladders and scaffolds; occasional bending, balancing, crouching, stooping, kneeling, and crawling; can perform simple routine tasks involving no more than short, simple instructions, and simple work-related decisions with few workplace changes; can perform no work at a fixed production rate or pace; may have occasional contact with supervisors, coworkers, and no public contact; and can work in proximity to others but not in coordination with them.  (R. 48-49.)  VE Henzes testified that jobs would be available for such an individual, including video monitor, inspector, and document preparer.  (R. 49-50.)

5.   **ALJ Decision**

ALJ Wordsworth issued her decision on January 27, 2014, considering evidence submitted up to that date.  (R. 14-26.)  She made the following Findings of Fact and Conclusions of Law:

1.   The claimant last met the insured status requirements of the Social Security Act on December 31, 2013.

2.   The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 27, 2008 through her date last insured of December 31, 2013 (20 CFR 404.1571 et seq.).

3.   Through the date last insured, the claimant had the following severe impairments: obesity; schizoaffective disorder; generalized anxiety disorder; post-traumatic stress disorder (PTSD); bipolar disorder; alcohol abuse; hypertension; and bilateral carpal tunnel syndrome (20 CFR 404.1520(c)).

4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except frequent climbing stairs and ramps; frequent but not constant handling and fingering with the bilateral upper extremities; occasional climbing ropes, ladders, and scaffolds, occasional bending, balancing, crouching, stooping, kneeling, and crawling; with simple routine tasks involving no more than simple, short instructions and simple, work-related decisions with few workplace changes; no work at a fixed production rate or pace; occasional contact with supervisors and coworkers, and no public contact; and can work in

proximity to, but not in coordination
with, others.

6.  Through the date last insured, the
claimant was unable to perform any past
relevant work (20 CFR 404.1565).

7.  The claimant was born on November 3,
1983 and was 30 years old, which is
defined as a younger individual age 18-
44, on the date last insured (20 CFR
404.1563).

8.  The claimant has at least a high school
education and is able to communicate in
English (20 CFR 404.1564).

9.  Transferability of job skills is not
material to the determination of
disability because using the Medical-
Vocational Rules as a framework supports
a finding that the claimant is "not
disabled," whether or not the claimant
has transferable job skills (See SSR 82-
41 and 20 CFR Part 404, Subpart P,
Appendix 2).

10.  Through the date last insured,
considering the claimant's age,
education, work experience, and residual
functional capacity, there were jobs
that existed in significant numbers in
the national economy that the claimant
could have performed (20 CFR 404.1569
and 404.1569(a)).

11.  The claimant was not under a disability,
as defined in the Social Security Act,
at any time from September 27, 2008, the
alleged onset date, through December 31,
2013, the date last insured (20 CFR
404.1520(g)).

(R. 16-26.)

ALJ Wordsworth thoroughly reviewed the evidence of record and
identified the bases for the Findings of Fact and Conclusions of

Law.  (*Id.*)

Regarding Listing 12.04 and other mental impairment listings, the ALJ reviewed the evidence relied upon by Plaintiff's counsel-- Dr. Laudadio's August 21, 2012, psychiatric evaluation and Ms. Rahn's medical source statement--and concluded they did not support impairments of listing level severity nor did other evidence of record.  (R. 19-21.)

She found that Plaintiff was not entirely credible concerning the intensity, persistence and limiting effects of her symptoms for the period of June 3, 2011, through the date of the decision.  (R. 21-22.)  ALJ Wordsworth noted that Plaintiff's mental status examinations were basically within normal limits, with Plaintiff communicating clearly and no evidence of abnormal movement or psychotic symptoms.  (R. 22.)  The ALJ also pointed to significant gaps in Plaintiff's history of treatment and evidence that she was not entirely compliant with prescribed medications which she found suggestive of symptoms less limiting than alleged.  (*Id.*)

Regarding opinion evidence, the ALJ found GAF scores ranging from 51 to 60 indicative of moderate symptoms/difficulties and basically supportive of an ability to work.  (R. 23.)  She noted that Ms. Rahn was not an acceptable medical source and her opinion that Plaintiff was unable to meet competitive standards was not persuasive because treating notes and mental status examinations did not support the limitations asserted.  (R. 23-24.)  ALJ

Wordsworth attributed significant weight to Dr. Gavazzi's opinion that Plaintiff could perform simple, routine, repetitive work in a stable environment because it was based on a thorough review of the record and Dr. Gavazzi provided explanations for his conclusions. (R. 24.)

The ALJ gave little weight to Dr. Graves' opinion that Plaintiff could perform less than sedentary work due to carpal tunnel syndrome.  (R. 24.)  She noted that the limitations found by Dr. Graves were not supported by the evidence of record--Plaintiff underwent only medication management with very little counseling for mental impairments and no significant treatment for physical impairments.  (*Id.*)

Finally, the ALJ gave little weight to Plaintiff's mother's Function Report to the extent it suggested limitations greater than those found in the RFC for the same reasons she did not find Plaintiff's subjective complaints fully credible.  (*Id.*)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[5]  It is necessary for the

---

[5]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

only if his physical or mental impairment or

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of

---

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 25.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel
> non* of substantial evidence is *not* merely a

21

> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."

22

*Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a

claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

### IV. Discussion

Plaintiff alleges that the Acting Commissioner's decision should be reversed or the matter should be remanded for the following reasons: 1) substantial evidence does not support the ALJ's finding that Plaintiff's mental health impairments do not meet or equal listing 12.04; 2) substantial evidence does not support the ALJ's RFC assessment; 3) the ALJ erred in relying on the non-examining physician over the treating physician's opinion; 4) the ALJ failed to properly evaluate lay opinions and medical evidence of record; 5) substantial evidence does not support the ALJ's credibility evaluation; and 6) the Commissioner failed to sustain her burden of showing there is other work in the national economy that Plaintiff could perform. (Doc. 12 at 2.)

### A.   *Listing 12.04*

Plaintiff asserts that the ALJ's conclusion that Plaintiff's mental impairments do not meet or equal listing 12.04 is not

supported by substantial evidence.  (Doc. 12. at 13.)  Defendant
asserts that substantial evidence supports the determination.
(Doc. 14 at 14.)  I conclude Plaintiff has not shown that the ALJ
erred on the basis alleged.

Plaintiff's argument is basically conclusory in nature.  (*See*
Doc. 12 at 13-16.)  She cites to evidence that predates the amended
onset date of June 3, 2011.  (Doc. 12 at 13.)  Plaintiff does not
acknowledge that from November 2010 until February 11, 2011, she
was off medications and improvement was noted from that point
through the date last insured, i.e., her June 27, 2011, T.W.
Ponessa visit where she described improvement and well-controlled
symptoms.  (R. 361-71.)  Throughout this period, Plaintiff
declined the individual therapy recommended.  (R. 362, 364, 366,
371.)  Significantly, she did not continue with treatment at T.W.
Ponessa after June 2011 despite the recommendation that she return
in four weeks, and the record indicates she did not again receive
medical treatment for her mental health issues until August 2012
when she saw Saverio Laudadio, M.D. (R. 285, 362.)

Plaintiff's citation to Dr. Laudadio's August 21, 2012,
evaluation focuses on Plaintiff's reports regarding her mental
health history rather than to mental status findings.  (Doc. 12 at
14 (citing R. 285).)  A subjective history of symptoms does not
support listing level severity during the relevant time period.
Importantly, the Mental Status Examination showed that Plaintiff

was alert and cooperative, oriented times three, and there was no evidence of hallucinations, delusions or illusions. (R. 286.) Further, the ALJ carefully reviewed this evidence and thoroughly explained why it did not support Plaintiff's contention that her impairment met or equaled listing 12.04. (*See* R. 19.)

Plaintiff also relies on Ms. Rahn's Mental Impairment Questionnaire in support of finding listing level severity. (Doc. 12 at 15.) Again the ALJ explained why this evidence did not support the severity alleged and we find no error in this assessment. (R. 19.) Plaintiff's recitation of Ms. Rahn's conclusions does not show that "objective medical findings" establish listing level severity. (*See* Doc. 12 at 16.)

Plaintiff has not shown that the ALJ's step three determination is not supported by substantial evidence. Therefore, this claimed error is not cause for reversal or remand.

**B.   *RFC Assessment***

Plaintiff first maintains the RFC determination is error because the limitations established did not account for Plaintiff's difficulty with concentration, persistence or pace. (Doc. 12 at 17-18.) Defendant asserts these difficulties were properly accounted for in the RFC. (Doc. 14 at 15.) I conclude Plaintiff has not shown that the ALJ erred on the basis alleged.

In support of her assertion, Plaintiff relies on *Ramirez v. Barnhart*, 372, F.3d 546, 554 (3d Cir. 2004), stating that

> [i]n *Ramirez*, the Third Circuit held that a
> restriction to simple one-or-two step tasks
> did not adequately encompass the deficiencies
> in concentration, persistence, or pace the
> ALJ [found] claimant to have, noting that
> jobs with simple tasks might also have
> production quotas and require a certain
> degree of pace. *Id.*

(Doc. 12 at 18.)

Plaintiff's reliance on *Ramirez* is clearly misplaced in that here the potential pace problem is addressed in the RFC: ALJ Wordsworth specifically noted that Plaintiff could not do work "at a fixed production rate or pace."  (R. 21.)   Thus, this basis for Plaintiff's claimed error is without merit.

Plaintiff also points to SSR 85-15 in support of her claimed RFC error.  (Doc. 12 at 21.)   This argument is not adequately articulated and relies in large part on Ms. Rahn's Mental Impairment Questionnaire findings.  (*See id.* at 21-22.)   As the ALJ adequately explained the limited weight attributed to the findings in the questionnaire (R. 23-24), any claimed inability to work based on Ms. Rahn's findings is without merit.[6]  Additional

---

[6]  As the ALJ pointed out, Plaintiff made some progress controlling her moods without all her medications when she was pregnant and the therapist (Ms. Rahn) noted that hallucinations occurred during periods of extreme stress.  (R. 23.)  Ms. Rahn's earlier notes from the November 2012 Person Centered Treatment Plan do not identify hallucinations as current problems, and indicate that Plaintiff wanted to get a part-time job with the agreed upon objective of applying for one job between each session.  (R. 289-93.)  The next record authored by Ms. Rahn is the November 2013 Person Centered Treatment Plan (R. 462-64) referred to by ALJ Wordsworth at which time Plaintiff had stopped taking Wellbutrin and Abilify due to her pregnancy (*see* R. 325).  Plaintiff

averments set out in Plaintiff's reply brief and the conclusory statement that the evidence cited renders the ALJ's hypothetical defective (Doc. 15 at 2-3) do not support Plaintiff's claimed RFC inadequacy.  This is particularly so in that many citations to the record refer to reports outside the relevant time period or a *history* of problems (R. 285, 289, 307, 378, 385) and others refer to times when Plaintiff had not been taking medications or had recently resumed taking them (R. 367, 370).

**C.   *Opinion Evidence***

Plaintiff next contends that the ALJ erred in relying on the non-examining source opinion over that of the treating physician's opinion.  (Doc. 12 at 22.)  Defendant responds that substantial evidence supports the weight attributed to these opinions.  (Doc. 14 at 19.)  I conclude Plaintiff has not shown that the ALJ erred on the basis alleged.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  Sometimes called the "treating physician rule," the

---

correlated increased symptoms to the discontinuation of these medications and increased stress due to pregnancy complications. (R. 325, 462.)  These considerations undermine Ms. Rahn's categorical conclusions regarding Plaintiff's prognosis and inability to function (R. 475-80).

principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).[7]  "A cardinal principle

---

[7] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of

guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); see also *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The Court of Appeals for the Third Circuit addressed a plaintiff's argument that an ALJ failed to give controlling weight to the opinion of a treating physician in *Horst v. Commissioner of Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not precedential).

> "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).

> _____

> determination or decision for the weight we give your treating source's opinion.

30

> Controlling weight is given when a treating
> physician's opinion is "well supported by
> medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent
> with the other substantial evidence."  20
> C.F.R. § 404.1527(d)(2).  "Although the ALJ
> may weigh the credibility of the evidence, he
> must give some indication of the evidence that
> he rejects and his reason(s) for discounting
> that evidence."  *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46.  *Horst* noted that neither the ALJ nor the court

needed to rely on the treating physician's opinion that the

plaintiff was completely disabled: "As an initial matter, 'the

ALJ--not treating or examining physicians or State agency

consultants--must make the ultimate disability and RFC

determinations."  551 F. App'x at 46 n.7 (quoting *Chandler v.*

*Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20

C.F.R. § 404.1527(d)).  Although it is true that an ALJ's

credibility judgments alone cannot override a treating physician's

medical opinion that is supported by the evidence, *Morales v.*

*Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon

more than personal observations and credibility determinations in

discounting the treating physician's finding of disability," the

ALJ does not run afoul of relevant law.  *Drejka v. Commissioner of*

*Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not

precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318

(3d Cir. 2000) (holding that an ALJ's credibility judgments alone

cannot override a treating physician's medical opinion that is

supported by the evidence)).  *Drejka* also noted that where the

31

treating physician made the determination the plaintiff was disabled only in a form report, the Third Circuit Court has characterized such a form report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'" 61 F. App'x at 782 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

The regulations also provide that greater deference is due an examining source than a non-examining source.   20 C.F.R. § 404.1527(c)(1).   Section 404.1527(c)(3) states the following:

> The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.   The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

*Id.*

Plaintiff first takes issue with the weight assigned Dr. Graves' opinion.  (Doc. 12 at 22.)  She apparently recognizes that the opinion is not entitled to controlling weight with her argument that SSR 96-2p indicates that a treating source's medical opinion may be entitled to the greatest weight even where it lacks the necessary support.  (*Id.* at 23.)   While Plaintiff is correct that

20 C.F.R. § 404.1527(c)(2) requires consideration of certain factors where a treating source's opinion is not accorded controlling weight (*id.*), she cites no support for the proposition that an ALJ's failure to articulate each factor in her decision is error requiring remand.  Here the ALJ did not undermine the treating or examining relationship without explanation, but rather she found it was not well-supported for specific reasons: Plaintiff had no significant treatment for physical impairments; Plaintiff testified that the wrist braces were prescribed by her ob/gyn; and the record contained no evidence of nerve conduction studies or treatment for bilateral carpal tunnel syndrome except for Dr. Graves' statement.  (R. 17, 24.)   Furthermore, Plaintiff's assertion that the ALJ "did not assign any weight whatsoever" to Dr. Graves' opinion (Doc. 12 at 24) is incorrect: the ALJ assigned "little weight" to the opinion.  (R. 24.)

Concerning Ms. Rahn's opinion, Plaintiff asserts that it "should have been assigned weight and taken into consideration." (Doc. 12 at 26.)  Contrary to Plaintiff's contention, the ALJ took the opinion into consideration but she did not find it persuasive for specific reasons: treating notes did not support the limitations nor did mental status examinations which were basically within normal limits (issues thoroughly reviewed earlier in the decision (R. 22-23)).  (R. 24.)

Finally, regarding Dr. Gavazzi's opinion, Plaintiff provides a

33

brief reference to SSR 96-6p, stating that a State agency opinion can be given greater weight than a treating source only under special circumstances, "such as if the State Agency Consultant's opinion is based on a review of the complete case record that includes a medical report from a specialist in the individual's particular impairment area which provides more detailed comprehensive information than what was available to the individual's treating source." (Doc. 12 at 26.)  This is not a completely accurate recitation of the guidance provided in SSR 96-6p in that the scenario set out by Plaintiff is offered by way of example, explaining the statement that opinions from State agency consultants may be entitled to greater weight than treating or examining sources "[i]n appropriate circumstances."  SSR 96-6p (S.S.A.), 1996 WL 374180, at *3 (July 2, 1996).  Moreover, Plaintiff does not apply the principle here but rather notes that Dr. Gavazzi had no interaction with Plaintiff and, therefore, his opinion was entitled to "little, if any weight." (*Id.* at 27.) This conclusory statement does not satisfy Plaintiff's burden of showing error, particularly in this situation where the treating source opinions were provided in check-the-box forms and were contradicted by other evidence of record and the State agency consultant provided explanations for his opinion.[8]

---

[8]  Dr. Gavazzi reviewed records from NHS through November 2012, including Dr. Laudadio's August 2012 psychiatric evaluation and his medication management notes from October and November 2012.

In her reply brief, Plaintiff takes issue with Defendant's notation that she "consistently presented with normal findings on mental status examinations." (Doc. 15 at 3 (citing Doc. 14 at 20).)  To counter this statement, Plaintiff first cites a February 2, 2011, medication management appointment where numerous problems were reported.  (*Id.* (citing R. 367).)  This record predates the June 3, 2011, alleged onset date by several months.  Moreover, Plaintiff had not been seen since October 2010 and had not taken her medications since November 2010.  (R. 367.)  Therefore, any symptoms noted at the February 2011 appointment cannot be considered to be of longitudinal significance.  This is similarly true for Plaintiff's citation to the March 2011 appointment notes in that, after resuming medication the preceding month, it was recorded that Plaintiff "did not see much improvement *yet*."  (R. 370 (emphasis added).)  As noted above in conjunction with Plaintiff's reply regarding her claimed RFC error, many other

---

(*See* R. 109.)   Dr. Laudadio is "a specialist in the individual's particular impairment area."  (Doc. 12 at 26.)  It is unclear what records were available to Dr. Graves and Ms. Rahn.  These considerations indicate it is unclear how SSR 96-6p applies to the circumstances of this case.  It is also noteworthy that the record does not appear to contain acceptable medical source mental health treatment records which post date Dr. Gavazzi's opinion, undermining any inference that Dr. Gavazzi's opinion is not based on sufficient evidence.  Furthermore, the record indicates that the decline in Plaintiff's mental health condition noted by Ms. Rahn in her November 2013 Person Centered Treatment Plan which likely formed a basis for the functional limitations assessed in her November 2013 Mental Impairment Questionnaire was attributable to Plaintiff's discontinuation of certain medications due to pregnancy and pregnancy complication stress.  (R. 325, 462, 4676-80.)

citations to the record (Doc. 15 at 4) do not provide the suggested support because of time frame and/or contextual issues.

Because Plaintiff has failed to show that ALJ Wordsworth's evaluation of the opinions of Dr. Graves, Ms. Rahn, and Dr. Gavazzi are not supported by substantial evidence, this claimed error is not cause for reversal or remand.

## D.   *Evaluation of Lay Opinions and Medical Evidence*

Plaintiff asserts that the ALJ improperly evaluated lay opinion evidence from Plaintiff's mother, Jody Kreiser, whose statements are supported by medical evidence of record, citing SSR 06-03p in support of her argument that the opinion was due greater weight.  (Doc. 12 at 27-28.)  I conclude Plaintiff has not shown that this claimed error is cause for remand.

SSR 06-03p states in pertinent part that consideration of opinions from family members should include consistency with other evidence and any other factors that tend to support or refute the evidence.  SSR 06-03P, 2006 WL 2329939, at *6 (Aug. 9, 2006).

Regarding consistency, Plaintiff's citations to the record in support of Ms. Kreiser's statements, particularly referencing visual and auditory hallucinations (Doc. 12 at 28 (citing R. 285, 289, 307, 361, 367-68, 370, 378, 385, 475-80)), do not provide the suggested support.  First, a noted "history" of hallucinations does not support ongoing hallucinations during the relevant time period. (*See* R. 285, 289.)  Second, records predating the relevant time

36

period by more than one year do not support limitations during the relevant time period. (*See* R. 307, 368, 384.)  Third, records indicating that Plaintiff experienced hallucinations during a time period when she was not taking her medications or just restarting them do not support a longitudinal problem. (*See* R. 367, 370.) Fourth, because we have found the ALJ appropriately found Ms. Rahn's report (R. 475-80) unpersuasive, Plaintiff's reliance on it in support of Ms. Kreiser's statements does not point to error.

Because Plaintiff has failed to show that ALJ Wordsworth's consideration of Ms. Kreiser's function report is not supported by substantial evidence, this claimed error is not cause for reversal or remand.

## E.   *Credibility*

Plaintiff contends that substantial evidence does not support the ALJ's credibility determination. (Doc. 12, at 28.)  Defendant maintains that the ALJ's determination that Plaintiff is not fully credible is supported by substantial evidence. (Doc. 14 at 23.)  I conclude Plaintiff has not shown that the ALJ erred in her credibility analysis.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'" *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v.*

*Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility

determinations are the province of the ALJ and should only be

disturbed on review if not supported by substantial evidence."

*Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D.

Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873

(3d Cir. 1983)).  An ALJ is not required to specifically mention

relevant Social Security Rulings.  *See Holiday v. Barnhart*, 76 F.

App'x 479, 482 (3d Cir. 2003).  It is enough that the ALJ's

analysis by and large comports with relevant provisions.  *Id.*

Plaintiff first infers that the ALJ did not properly assess

her activities of daily living, specifically noting that her

abilities at home "do not reflect her capacity to function 'in an

ordinary work setting on a regular and continuing basis.'"  (Doc.

12 at 29 (quoting SSR 96-8p).)  Plaintiff does not make a specific

argument on this issue, rather she points to testimony about her

limitations.  (Doc. 12 at 30.)  Because the ALJ cited numerous

reasons why she found the testimony less than credible (R. 22, 24),

to show the ALJ erred Plaintiff must point to more.

Plaintiff next asserts the ALJ did not discuss how her

medications would affect her ability to function on a regular

basis.  (Doc. 12 at 31.)  In support of this assertion, Plaintiff

quotes a report which stated "'she looked tired on Haldol.'"  (Doc.

12 at 31 (quoting R. 361).)  This single example of a medication-

related observation falls far short of satisfying Plaintiff's

38

burden of showing error.  This is particularly so where the
observation regarding Haldol was made in the context of a mental
status examination which was essentially normal (R. 361), Plaintiff
did not seek treatment for over a year after that observation was
made in June 2011, no medication side effects were noted in her
August 2012 psychiatric evaluation (R. 285-88), and October and
November 2012 Medication Management Progress Notes specifically
indicated that Plaintiff had no medication side effects (R. 301,
303).

Plaintiff also criticizes the ALJ's treatment of GAF scores
contained in the record.  (Doc. 12 at 31 (citing R. 23).)  She
first criticizes any reliance on GAF scores and, alternatively,
points to the ALJ's focus on GAF scores ranging from 51-60 and
failure to mention GAF scores ranging from 30-45.  (*Id.*)  Plaintiff
does not correlate GAF score consideration with credibility so this
claimed error does not support Plaintiff's argument that the ALJ's
credibility evaluation is not supported by substantial evidence.
However, considered as an independent issue, I conclude Plaintiff's
GAF score criticism is without merit.  First, the ALJ's analysis of
GAF scores was only one aspect of her detailed RFC analysis.  (*See*
R. 22-25.)  Second, the ALJ acknowledged that the scores are of
limited evidentiary value and noted that she assigned more weight
to treatment records.  (R. 23.)  Third, Plaintiff's assertion that
the ALJ failed to mention GAF scores ranging from 30 to 45 and

thereby erroneously cherry picked GAF scores (Doc. 12 at 31 (citing R. 23, 307, 358, 475)) is not an accurate assessment of the record during the relevant time period.  While it is true that the ALJ did not specifically refer to lower GAF scores on the cited page in the Decision (R. 23), there was no reason for her to do so.  The GAF of 30 was assessed on admission to Philhaven on May 8, 2010--more than one year before the June 3, 2011, onset date--and was followed by a GAF of 51 assessed three days later when Plaintiff was discharged. (R. 307.)  The GAF of 40 assessed on June 24, 2009, was also long before the alleged onset date and was made at a time when Plaintiff had been off medications for approximately nine months.  (R. 358.) Plaintiff also points to the GAF assessment of 45 contained in Ms. Rahn's Mental Impairment Questionnaire (R. 475), the ALJ's consideration of which the Court has not found to be error.  Of note regarding the November 5, 2013, current GAF of 45 reported in the Questionnaire cited is the fact that in the Person Centered Treatment Plan of the same date Ms. Rahn assessed a current GAF of 52.  (R. 464, 475.)

In sum, Plaintiff has not shown that the ALJ's credibility determination is not based on substantial evidence.  Therefore, this claimed error is not cause for reversal or remand.

## F.   *Step Five*

Plaintiff's final claimed error is that the ALJ failed to sustain her burden of establishing that there is other work in the

national economy that she could perform.  (Doc. 12 at 32.)
Defendant maintains the ALJ satisfied her step five burden.  (Doc.
14 at 25.)  I conclude the ALJ did not err in her step five
determination.

With this claimed error, Plaintiff first points to a reasoning
level discrepancy between the exemplary jobs identified by the VE
which, according to the Dictionary of Occupational Titles ("DOT"),
require a reasoning level of "2" or "3," and Plaintiff's RFC
limitation to "'simple routine tasks involving no more than simple,
short instructions and simple, work-related decisions with few
workplace changes; no work at a fixed production rate or pace'"
which is commensurate with reasoning level "1" jobs.  (Doc. 12 at
32-33 (quoting R. 21).)  Plaintiff maintains that she could not
perform the exemplary jobs because of her limitation to performing
simple, routine tasks involving no more than simple, short
instructions and simple, work-related decisions.  (*Id.* at 34.)

Defendant responds that the DOT "'lists maximum requirements
of occupations as generally performed, not the range of
requirements of a particular job as it is performed in specific
settings,'" and it is "then for the VE to provide more specific
information on how the job is actually performed."  (Doc. 14 at 25-
26 (quoting SSR 00-4p, 2000 WL 1898794, at *2, 3 (2000)).)
Defendant asserts that here the VE's opinion that Plaintiff could
perform the exemplary jobs was a clarification contemplated by SSR

41

00-4p and the ALJ appropriately relied on it. (Doc. 14 at 26.)
Defendant adds that Plaintiff and her counsel had many
opportunities to object to the VE's qualifications and/or raise any
alleged conflict with the DOT at the ALJ hearing and, because they
did not do so, the Court should disregard the contention that the
VE's testimony was deficient. (*Id.*)

I concur with Defendant that this claimed error does not
establish a step five deficiency. Plaintiff presents no authority
to support the proposition that there is a *per se* conflict between
a reasoning level of two or three and the RFC limitations
determined by the ALJ, and our Court of Appeals has not established
a bright-line rule on this issue. *See Zirnsak v. Colvin*, 777 F.3d
607, 616-19 (3d Cir. 2014). Plaintiff did not raise the alleged
conflict at the ALJ hearing and does not argue that it was so
obvious that the ALJ should have done so on her own--both
identified as relevant considerations in *Zirnsak*. 777 F.3d at 618.
Finally, Plaintiff does not refute Defendant's argument in her
reply brief. (*See* Doc. 15.)

Plaintiff also asserts that she could not perform two of the
three jobs identified by the VE because she is not capable of the
constant use of hands required by these positions. (Doc. 12 at 34-
35.) This assertion does not support Plaintiff's claimed step five
error in that the jobs are exemplary and, further, Plaintiff does
not refute her ability to perform the video monitor job identified

42

by the VE.

### V. Conclusion

For the reasons discussed above, Plaintiff has failed to show that any of the claimed errors are cause for reversal or remand. Thus, I conclude Plaintiff's appeal of the Acting Commissioner's denial of benefits (Doc. 1) is properly denied.  An appropriate Order is filed simultaneously with this Memorandum.


                         S/Richard P. Conaboy
                         RICHARD P. CONABOY
                         United States District Judge

DATED: February 22, 2016